Jonathan Shub (N.J. Bar # 317842020)
Kevin Laukaitis (N.J. Bar # 155742022)
**Shub Law Firm LLC**
134 Kings Highway East
2nd Floor
Haddonfield, NJ 08033
Phone: (856) 772-7200
Email: jshub@shublawyers.com
        klaukaitis@shublawyers.com

*Attorneys for Plaintiff and the Putative Class*
(Additional counsel on signature page)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ANDREW GANT**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**DIRECT ENERGY SERVICES, LLC and NRG ENERGY, INC.,**<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff Andrew Gant ("Plaintiff"), by and through his undersigned counsel, Edelson Lechtin LLP and Shub Law Firm LLC, on behalf of himself and all other persons similarly situated, brings this Class Action Complaint against Direct Energy Services, LLC and NRG Energy, Inc. (collectively "Direct Energy" or "Defendants"), and alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief based upon, *inter alia*, investigations conducted by his attorneys.

## NATURE OF THE CASE

1.      This action is brought as a class action on behalf of Plaintiff and a putative class of New Jersey consumers seeking redress for the deceptive, unlawful and bad faith pricing practices of Defendants that have caused at least tens of thousands of consumers to pay considerably more for their electricity and/or natural gas than they should otherwise have paid.

2.      Direct Energy, an Energy Service Company or "ESCO,"[1] has exploited the deregulation of the retail electricity and natural gas markets by luring consumers into switching electricity and natural gas suppliers using a bait-and-switch pricing scheme designed to deceive reasonable consumers. Direct Energy entices customers into switching to their electricity supply services by offering, for a limited period of time, teaser rates that are initially lower than the local (or "public") utilities' market rates. Once the initial rate expires, however, Direct Energy automatically switches their customers over to their more costly variable rate.

3.      Direct Energy's variable rates are substantially higher than the competing local utilities' market rates and are invariably higher than Direct Energy's own initial teaser rates.

4.      Direct Energy's pricing scheme is entirely discretionary and deceptive.

5.      As a TPS, Direct Energy is required to abide by the N.J. Admin. Code § 14:4-7.1 *et seq*. (the "Retail Choice Consumer Protection laws") (hereinafter referred to as the "Pricing and Marketing Regulations" or "Regulations").

6.      The Marketing Regulation provides, in part, that "If a TPS does not offer a fixed price or guaranteed price electric generation service or gas supply service, the TPS shall describe in clear and conspicuous language the mechanism or formula by which the price is determined, and provide a detailed customer bill comparison[.]" N.J.A.C. § 14:4-7.4(b)(2).

---

[1] In New Jersey, ESCOs are also referred to as licensed electric and natural gas third party suppliers ("TPS"). TPS and ESCO will be used interchangeably to describe Direct Energy throughout this Complaint.

7.      The Pricing Regulation requires that "if a fixed pricing arrangement is not made" in the terms and conditions of a TPS contract, "a clear and unambiguous statement of the precise mechanism or formula by which the price will be determined" must be included. N.J.A.C. § 14:4-7.6(b)(2).

8.      Direct Energy's New Jersey Residential & Small Commercial Terms and Conditions ("Terms and Conditions") did not comply with the Regulations.

9.      Simply put, only one clause in Direct Energy's Terms and Conditions describes the basis of its electric variable rate, and it states that "While taking service on a month-to-month basis, Direct Energy will charge you at a variable price per kWh based upon generally prevailing market prices for electricity in the Electric Distribution Company load zone for the applicable period, plus an adder, determined solely by Direct Energy in its sole discretion." Direct Energy's New Jersey Residential & Small Commercial Terms and Conditions are attached hereto as **Exhibit A** at § 8.

10.     Likewise, for natural gas, Direct Energy represents, "During the Renewal Period, Direct Energy will charge you for all natural gas billed by your GDC at a variable rate per Therm based upon generally prevailing market prices for natural gas for the applicable period, plus an adder, which will be determined solely by Direct Energy in its discretion." **Exhibit A** at § 8.

11.     The vague and non-descript factors – "generally prevailing market prices" and "adder" – are neither clear nor unambiguous and thus, violative of the Regulations.

12.     The entire purpose of the Regulations is to protect consumers from a TPS's unfettered discretion in setting prices. The Regulations are also designed to inform a consumer, ahead of time, of the precise formula by which the consumer's rates will be determined.

13.     Indeed, one of the obvious benefits of the Regulations is that the consumer will know how his/her rates are calculated and set. Another benefit is that the consumer can protect him/herself if the ESCO deviates from its promised formula.

14.     Direct Energy failed to abide by the Regulations by setting forth an ambiguous pricing mechanism.

15.     By failing to provide this required and critical information, Direct Energy was able to inflict the precise harm that Plaintiff suffered – being charged entirely discretionary energy rates untied to any precise mechanism or formula.

16.     Indeed, because Direct Energy failed to comply with these Regulations, Plaintiff was unable to protect himself from being subject to completely discretionary pricing.

17.     Direct Energy's violation of these regulatory violations constitutes substantial aggravating circumstances that are unlawful and unconscionable consumer practices under the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1 *et seq*.

18.     Direct Energy's violation of these Regulations also constitutes of a breach of contract.

19.     Moreover, Direct Energy acted in bad faith when it violated the Pricing Regulations. The ambiguity of the pricing term set the parameters which allowed Direct Energy unfettered discretion to charge whatever they wished.

20.     Direct Energy's failure to comply with the Regulations is what permitted them to charge Plaintiff whatever Direct Energy wanted – unmoored from any specific pricing formula or mechanism – and Plaintiff experienced the adverse consequences in the performance of the parties' agreement.

21.     No reasonable consumer, including Plaintiff, would understand Direct Energy's pricing representations as granting Direct Energy unfettered discretion to raise their variable rate as high as they please in order to maximize profits.

22.     As a result of Direct Energy's unlawful and bad faith pricing scheme, New Jersey consumers are being fleeced millions of dollars in exorbitant charges for electricity and/or natural gas.

23.     Plaintiff, on behalf of the Class he seeks to represent, brings this lawsuit based on Direct Energy's unlawful and unconscionable consumer practices under the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1 *et seq*., breach of contract, breach of the implied covenant of good faith and fair dealing, as well as its violations of the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act, N.J.S.A. § 56:12-15 (the "TCCWNA"), and unjust enrichment.

24.     Accordingly, this lawsuit seeks, *inter alia*, injunctive relief, actual damages and refunds, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

25.     Plaintiff Andrew Gant is a citizen of New Jersey and a resident of Audubon Township in Camden County, New Jersey. Mr. Gant was a customer of Direct Energy from October 2016 until March 2022, and as a result of Defendant's deceptive, unlawful, and bad faith conduct, he incurred excessive charges for electricity and natural gas during that period.

26.     Defendant Direct Energy Services, LLC is a corporation organized under the laws of the State of Delaware whose principal place of business and corporate headquarters is located in Houston, Texas. Upon information and belief, Direct Energy's members are citizens of Texas.

27.     Direct Energy Service, LLC is a subsidiary of NRG Energy, Inc.

28.     Defendant NRG Energy, Inc. is a corporation organized under the laws of the State of Delaware whose principal place of business and corporate headquarters is located in Houston, Texas.

29.     Direct Energy has tens of thousands of customers in New Jersey and earns tens of millions of dollars of revenue each year.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), 1453 and 1711 - 1715. Plaintiff and all members of the Putative Class are citizens of New Jersey, while Defendants are citizens of Texas. The amount in controversy exceeds $5,000,000. This Court has personal jurisdiction over Defendants, in that Direct Energy is registered to do business in New Jersey, conducts business in New Jersey, and otherwise has sufficient contacts with New Jersey that jurisdiction over it is proper in this District.

31.     Venue is proper in this District because Plaintiff is a citizen of New Jersey, Defendants do business in New Jersey, and the transactions that are the subject of this action took place in New Jersey and had their effects in New Jersey.

## OPERATIVE FACTS

### A.     Background on Energy Supply Companies ("ESCOs")

32.     Prior to 1997, energy utility companies sold electricity and natural gas and delivered it through their infrastructure to individuals and businesses. Thus, consumers did not have a choice to buy energy from alternative suppliers. In 1997, 17 states began to deregulate energy. This allowed independent energy supply companies ("ESCOs") or Third-Party Suppliers ("TPSs") to supply electricity and natural gas to homes and businesses at prices based on current market values. One of the primary goals of deregulation was increased competition in the industry, with a focus on achieving greater consumer choice and reduced energy rates.

33.    In an energy deregulation state like New Jersey, the utility company, or "LDC", is not allowed to profit from buying or selling energy. Whatever the energy costs the utility company to produce or procure is what they may charge the customer. They can profit only from the delivery. They own the wires the energy is sent through and get paid for the delivery of the energy no matter where it comes from. Of course, utilities still must cover for ordinary operating expenses, such as rent, payroll, supplies, marketing, and overhead. Thus, local utilities cannot simply buy electricity and natural gas at the wholesale market rate and sell it to their customers at that same rate.

34.    In contrast, ESCOs can profit from buying and selling energy to customers, because they are not subject to the same regulations as utility companies. Thus, deregulation enables energy customers to shop for electric and natural gas services by separating the supply and delivery portion of these services and opening up the supply portion to competition from ESCOs. This supposedly enables consumers to shop around for the best price on their energy supplies and in turn, save money on their energy bills.

35.    In deregulation states, ESCOs may compete to supply the energy services, but the local electric and natural gas companies continue to deliver power through their wires regardless of which company supplies them. In addition, the local public utility may continue to supply metering, billing, and related administrative services to the consumer, regardless of who supplies the energy services. Thus, the public utility continues to generate and send periodic bills directly to the consumer for the energy it supplies, even after a consumer has enrolled in or "switched" to an ESCO. The fact that the energy services for which the customer is being billed are now being provided by an ESCO is noted on the bill, often in very fine print that is easily overlooked. The bill otherwise looks substantially the same as it did before the switch.

**B.**     **The Failure of Energy Deregulation and Resulting Harm to Consumers**

36.     Almost all states that deregulated their energy markets did so in the mid- to late-1990s. This wave of deregulation was frantically pushed by then-corporate behemoth Enron. For example, in December 1996 when energy deregulation was being considered in Connecticut, "the most aggressive proponent" of deregulation, Enron CEO Jeffrey Skilling, said:

> Every day we delay [deregulation], we're costing consumers a lot of money . . . . It can be done quickly.  The key is to get the legislation done fast.[2]

37.     Changing the industry under this sense of urgency and with inadequate protections against abuse resulted in serious harm to consumers in deregulated states and has spawned a return to sensible regulation. The number of full or partially deregulated states has dwindled to only seventeen and the District of Columbia, down from forty-two states in 2001 that had started or were considering deregulation. Even some deregulated states have recognized deregulation's potential harm to everyday consumers and now only allow large-scale consumers to shop for their energy supplier.

38.     Responding to shocking energy prices often paid by ordinary consumers, many key supporters of deregulation now regret the role they played. For example, reflecting on Maryland's failed deregulation experience, a Maryland Senator commented: "Deregulation has failed. We are not going to give up on re-regulation till it is done."[3]

39.     A Connecticut leader who participated in that state's experiment with energy deregulation was similarly regretful:

> Probably six out of the 187 legislators understood it at the time, because it is so incredibly complex . . . .  If somebody says, no, we didn't screw up, then I don't know what world [they] are living in.  We did.[4]

---

[2] Christopher Keating, *Eight Years Later ... "Deregulation Failed"* HARTFORD COURANT, Jan. 21, 2007.
[3] David Hill, State Legislators Say Utility Deregulation Has Failed in its Goals, THE WASHINGTON TIMES, May 4, 2011.
[4] Keating, *supra* note 5.

40.     Massachusetts Attorney General Maura Healey has also expressed serious concerns about deceptive practices of competitive energy suppliers like Direct Energy. In March 2018, Attorney General Healey issued a report calling for an end to the competitive energy supply market for individual residential customers in Massachusetts, as a result of the false and deceptive promises made by competitive energy suppliers like Direct Energy: "Competitive electric suppliers promise big energy savings but are actually burdening customers with hundreds of dollars in extra costs."[5]

C.      **The History Of New Jersey's Energy Industry**

41.     In 1999, New Jersey deregulated the market for electricity and natural gas supply, a major break with past policy. Prior to deregulation, electricity and natural gas was supplied and distributed solely by local utility companies. Deregulation was supposed to enhance competition between energy providers. The theory was that competition would result in ESCOs being more aggressive than the utilities in reducing wholesale purchasing costs and thereby lower retail residential energy rates – saving customers money on their energy bills.

42.     ESCOs such as Direct Energy have various options to buy electricity and natural gas at wholesale for resale to retail customers in New Jersey, including: owning electricity and/or natural gas production facilities; purchasing electricity and/or natural gas from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing electricity and/or natural gas in advance of the time it is used by consumers, either by purchasing electricity and natural gas to be used in the future or by purchasing futures and forward contracts for the delivery of electricity and natural gas in the future at a predetermined

---

[5] *See* Report, Office of the Attorney General, Commonwealth of Massachusetts, *An Analysis of the Individual Residential Electric Supply Market in Massachusetts* (March 2018), https://tinyurl.com/Mass-Analysis, at viii.

price. The point of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce electricity and/or natural gas costs thereby allowing ESCOs to offer low or at least competitive rates as compared to the local utilities who have a dominant market share in the New Jersey energy market.

43.    If a customer switches to an ESCO, his or her energy will be "supplied" by the ESCO, but still "delivered" by their existing utility. The customer's existing utility continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is which company sets the price for the customer's energy supply.

44.    As part of the deregulation plan, ESCOs (like Direct Energy are not required to file either their electricity and natural gas rates or the method by which they set those rates with the New Jersey Board of Public Utilities ("NJBPU").

45.    Direct Energy's prices are not approved by the NJBPU. Rather, Direct Energy and other ESCOs set their own rates for supplying energy to consumers. And Direct Energy, like all other suppliers, relies upon the local utilities to deliver the energy it purchases on the wholesale market to its customers.

46.    PSE&G is required to submit its rates to the NJBPU for approval, and the charges assessed to customers for generation service "shall be regulated by the NJBPU." N.J.S.A. § 48:3-57(a)(1). PSE&G is Direct Energy's largest competitor per the company's 2017-2018 investor fact book, which states that PSE&G is "New Jersey's largest electric and gas utility."[6] PSE&G currently serves nearly three quarters of New Jersey's population in a service area consisting of a 2,600 square-mile diagonal corridor across the state from Bergen to Gloucester Counties. Indeed,

---

[6] *See* https://tinyurl.com/PSE-GFactbook, at 5.

PSE&G is the largest provider of electric service, serving 2.2 million electric customers in more than 300 urban, suburban and rural communities, including the state's six largest cities.[7]

**D.** **Direct Energy Violates the Electric Discount and Energy Competition Act and New Jersey's Retail Choice Consumer Protection Laws**

47.    The Electric Discount and Energy Competition Act ("EDECA"), N.J.S.A. § 48:3-49, *et seq*., authorized the New Jersey Board of Public Utilities ("Board") to adopt consumer protection standards for electric power suppliers and/or gas suppliers including, but not limited to, the marketing and advertising of utility services. N.J.S.A. § 48:3-85(a).

48.    In 2008, New Jersey adopted a statutory scheme designed to protect consumers from deceptive business practices in the energy industry. *See generally* N.J. Admin. Code § 14:4-7.1 *et seq*. (the "Regulations").

49.    The Regulations apply to all electric power suppliers and gas suppliers, including Direct Energy.

50.    These energy industry-specific consumer protection standards were prompted by regulators noticing a failure in the deregulated marketplace arising out of a lack of transparency on the part of ESCOs, as well as a lack of knowledge on the part of consumers. As a result of the information imbalance, ESCO consumers were often deceived into paying substantially more for electricity and natural gas supply than if they had continued to receive supply from their utilities, all the while thinking they are getting a better deal.

51.    In order to address the deregulated marketplace's failures, the energy industry-specific consumer protection statutes set forth stringent marketing, disclosure, and contractual requirements for TPS.

---

[7] *See* https://power2switch.com/utility/pseg/.

52.    For example, TPS are "prohibited from [m]aking false or misleading advertising claims to a potential residential customer." N.J. Admin. Code § 14:4-7.3(d)(1); *accord* N.J. Admin. Code § 14:4-7.4(n)(1) (same).

53.    Moreover, following a TPS' initial solicitation of a potential retail customer, the ESCO must provide the customer with a contract, which must "clearly and conspicuously state that the purpose of the document is to authorize a change in the customer's TPS, and include explicit terms and conditions." *Id.*

54.    Direct Energy was also obligated to follow—but instead violated—Section 14:4-7.6(b) of New Jersey's Administrative Code, which mandates that Direct Energy's Agreement provide "a clear and unambiguous statement of the precise mechanism or formula by which the price will be determined[.]" N.J. Admin. Code § 14:4-7.6.

55.    This provision is designed to protect customers from precisely the type of predatory behavior in which Direct Energy indulges but cannot justify.

56.    Thus, by requiring that that ESCOs "clear[ly] and unambiguous[ly]" describe the components of their variable rate pricing methodologies, New Jersey law prohibits ESCOs from providing customers with vague and non-descript pricing factors. As such, the pricing disclosures prevent ESCOs, like Direct Energy, from claiming that their pricing methodologies provide them with unfettered authority or discretion to set variable rates.

57.    However, the vague and non-descript factors – "generally prevailing market prices" and "adder" – in Direct Energy's Agreement are neither clear nor unambiguous and thus, violative of the Regulations.

58.    Direct Energy's deceptive practices emerge from, and attempt to exploit, the deregulation of the electricity and natural gas supply market in New Jersey. In doing so, Direct

Energy's Agreement directly contravenes its legal obligations to consumers, including Plaintiff Gant and the Class.

59.     Direct Energy is prohibited from arbitrarily setting its rates, *see* N.J. Admin. Code § 14:4-7.6(b), but that is exactly what Direct Energy did.

60.     Thus, the Agreement, interpreted in the light of N.J. Admin. Code § 14:4-7.6(b), does not afford Direct Energy the unfettered discretion it uses to set its rate based on unspecified, vague and non-descript factors. The discretion Direct Energy uses to set its rate based on unspecified, vague and non-descript factors must be reasonable.

61.     By engaging in unfair dealings, Direct Energy subverts the purpose of the deregulation of utilities in New Jersey and prevents its customers from receiving the benefits they were promised by Direct Energy. In reality, most customers, including Plaintiff Gant, would be far better off staying with their local utilities or previous energy suppliers than switching to Direct Energy because all Direct Energy does is abuse its discretion to charge unreasonable rates to profiteer off its customers.

62.     Instead of benefitting from switching to Direct Energy, typical customers lose out – to the tune of hundreds or even thousands of dollars per year. Thus, Direct Energy deceptively causes its customers to pay considerably more for electricity and/or natural gas services than they should have and otherwise would have paid.

63.     As such, Direct Energy's conduct is unlawful and therefore violative of the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1 *et seq*.

64.     Direct Energy's violation of the Pricing Regulations also constitutes breach of contract and breach of the implied covenant of good faith and fair dealing.

65.     Moreover, the Agreement itself is illegal and void and unenforceable *ab initio* because it violates N.J. Admin. Code § 14:4-7.6(b)(2).

66.     Under New Jersey law, any contract made in consideration of an act forbidden by law or against public policy is unenforceable.

67.     Plaintiff Gant and Class Members are entitled to damages accordingly.

**E.      Plaintiff Gant's Experience with Direct Energy**

68.     In or around October 2016, Plaintiff Gant was solicited by Direct Energy to switch his electricity and natural gas service from his local utility, PSE&G, enticed by Direct Energy's lower teaser rates. Induced by this promise, Plaintiff made the switch shortly thereafter.

69.     Plaintiff received Direct Energy's New Jersey Residential & Small Commercial Terms and Conditions ("Terms and Conditions" or "Agreement"). **Exhibit A**.

70.     The Agreement provided Mr. Gant with a seven-day rescissionary period during which he could rescind the Agreement prior to its commencement should he not agree to its terms. Specifically, the Agreement states that, "You will have seven (7) calendar days from the date of your utility's confirmation notice to cancel this agreement by contacting your utility with the contact information listed below." *See* **Exhibit A** at § 9.

71.     The Agreement also stated, "This Agreement represents the entire Agreement between the parties with regard to the subject matter hereof, **is subject to all valid and applicable laws and to all present and future orders, rules, and regulations of the board and any other authority having jurisdiction over the subject matter hereof**, and supersedes any previous promises, understandings and agreements between the parties." **Exhibit A** at § 24 (emphasis added).

72.     Based on Direct Energy's representations, Plaintiff Gant chose to not rescind the transfer to Direct Energy for electricity and natural gas and switched over to Direct Energy in October 2016. As a result, Plaintiff was placed on Direct Energy's fixed rate plan which subsequently converted to a variable rate plan.

73. Mr. Gant expected that Direct Energy would price their variable rate as obligated under the Agreement and as such under all applicable regulations set by the New Jersey Board of Public Utilities ("NJBPU").

74. However, the variable rate Direct Energy charged Plaintiff was consistently higher than his initial rate and was substantially higher than PSE&G's. Unfortunately, Mr. Gant's knowledge concerning commodity markets and prices -- like that of any other typical residential energy consumer -- was limited and prevented him from recognizing that Defendants were engaged in unauthorized pricing practices.

75. Moreover, Defendants failed to provide "a clear and unambiguous statement of the precise mechanism or formula by which the price will be determined," as required by N.J. Admin. Code § 14:4-7.6(b), and consequently deceived Plaintiff into consenting to a variable rate.

76. Plaintiff overpaid for electricity and natural gas because of Direct Energy's unfair, unlawful and deceptive acts and practices. He would not have enrolled in Direct Energy's plan but for its unlawful conduct. Had Plaintiff known that Direct Energy's rates would be significantly higher than his previous local utility and that Direct Energy would not abide by the Regulations as set forth herein, he would not have made the decision to enroll in Direct Energy's plan.

77. Plaintiff paid Direct Energy's variable rate until March 2022, when he canceled his service with Direct Energy. The following tables are a representative sample identify the billing periods during this time, the variable rates Defendants charged Plaintiff, the corresponding rates PSE&G would have charged for electricity and natural gas ("Public Utility Rate"), and the percent difference between the two prices. The charts demonstrate that Direct Energy charged Plaintiff entirely discretionary rates that were well-above the rates Plaintiff would have paid had he not switched to Direct Energy's plan.

**Electricity**:

| Billing Period | Direct Energy Price ($/kWh) | PSE&G Price ($/kWh) | Direct Energy Premium Above PSE&G Price |
|---|---|---|---|
| 12/24/20 – 1/25/21 | 0.228776 | 0.130305340 | 75.57% |
| 1/26/21 – 2/24/21 | 0.239600 | 0.128838950 | 85.97% |
| 2/25/21 – 3/25/21 | 0.241900 | 0.122493570 | 97.48% |
| 3/26/21 – 4/26/21 | 0.228900 | 0.129430690 | 76.85% |
| 4/27/21 – 5/25/21 | 0.225900 | 0.126849640 | 78.08% |
| 5/26/21 – 6/24/21 | 0.203740 | 0.132046000 | 54.29% |
| 6/25/21 – 7/26/21 | 0.198200 | 0.136629300 | 45.06% |
| 7/27/21 – 8/24/21 | 0.198200 | 0.135900180 | 45.84% |
| 8/25/21 – 9/23/21 | 0.205790 | 0.126697250 | 62.43% |
| 9/24/21 – 10/22/21 | 0.208100 | 0.122472610 | 69.92% |
| 10/23/21 – 11/22/21 | 0.208100 | 0.122961830 | 69.24% |

**Natural Gas**:

| Billing Period | Direct Energy Price ($/therm) | PSE&G Price ($/therm) | Direct Energy Premium Above PSE&G Price |
|---|---|---|---|
| 12/24/20 – 1/25/21 | 1.169709 | 0.320000380 | 265.53% |
| 1/26/21 – 2/24/21 | 1.179273 | 0.319982980 | 268.54% |
| 2/25/21 – 3/25/21 | 1.179273 | 0.320025200 | 268.49% |
| 3/26/21 – 4/26/21 | 1.140864 | 0.320008890 | 256.51% |
| 4/27/21 – 5/25/21 | 1.210439 | 0.320018330 | 278.24% |
| 5/26/21 – 6/24/21 | 1.222989 | 0.319877560 | 282.33% |
| 6/25/21 – 7/26/21 | 1.222989 | 0.319769970 | 282.46% |
| 7/27/21 – 8/24/21 | 1.222989 | 0.319800840 | 282.42% |
| 8/25/21 – 9/23/21 | 1.222989 | 0.320142480 | 282.01% |
| 9/24/21 – 10/22/21 | 1.222989 | 0.320013910 | 282.17% |
| 10/22/21 – 11/22/21 | 1.058029 | 0.319992580 | 230.64% |

78.     The entire point of energy deregulation is to allow ESCOs, like Direct Energy, to use their innovative purchasing strategies to reduce electricity and natural gas costs thereby *lowering* the electricity and natural gas rates that its customers pay.

79.     But instead, Direct Energy's variable rates always remain substantially higher than PSE&G's rates. In fact, in numerous months, Direct Energy's electricity rate remained at a level *over 70% higher* than PSE&G's rate. And Direct Energy's gas rates remained at an astronomical

level of ***over 250% higher*** than PSE&G's rates. There is simply no justification for these exorbitant rates.

80.     Direct Energy's energy is delivered by local utility companies, which has the exact same qualities as energy supplied by other suppliers or local utilities. There is ***nothing*** to differentiate Direct Energy from other suppliers or local utilities as to warrant higher rates, and the potential for a lower price is the only reason Plaintiff or any other reasonable consumer would enter into a contract for energy with Direct Energy.

81.     PSE&G is Direct Energy's primary electric and natural gas supplier and competitor in Mr. Gant's service area.

82.     And because the utility is the primary electricity and natural gas supplier and competitor in virtually all utility regions in New Jersey, including in Mr. Gant's utility region, its rates by definition represent reasonable market prices.

83.     Instead of abiding by the Regulations, Direct Energy used their variable rates as a pure profit center to charge Plaintiff whatever it felt like. These were commercially unreasonable rates.

84.     Direct Energy's unfair and deceptive acts and practices, and its misstatements and omissions, caused injury to Plaintiff and other reasonable consumers.

85.     Direct Energy breached the implied covenant of good faith and fair dealing as evidenced by Direct Energy's drastic rate disparities with those of the public utility and the fact that Direct Energy's rates were always higher than PSE&G's rates during the time Plaintiff was enrolled in Direct Energy's plan. Direct Energy does not charge a reasonable rate, but rather gouges its customers by charging outrageously high rates.

86.     Direct Energy intentionally fails to disclose this material fact to their customers because no reasonable consumer, including Plaintiff, who knows the truth about Direct Energy's exorbitant rates would choose Direct Energy as an energy supplier.

87.     Direct Energy's statements and omissions regarding their rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price. No reasonable consumer, including Plaintiff, who knew the truth about Direct Energy's exorbitant rates would choose Direct Energy as an energy supplier – but no reasonable consumer, including Plaintiff, could be expected to uncover the truth until after they have paid Direct Energy's exorbitant rates and had the opportunity to compare them to other rates charged during the same time period and in the same location.

88.     Direct Energy knowingly and intentionally made misleading statements regarding its rates so that reasonable consumers like Plaintiff and the Class would be induced to enroll in Direct Energy's energy plan.

89.     Direct Energy knows their rates are unconscionably high, and the misrepresentations it makes about its variable rates were made for the sole purpose of inducing consumers to sign up for Direct Energy's plan. Direct Energy reaps outrageous profits to the direct detriment of New Jersey consumers without regard to the consequences high utility bills cause such consumers. As such, Direct Energy acted with actual malice or with wanton and willful disregard for consumers' well-being.

90.     As a direct result of Direct Energy's misrepresentations, Plaintiff and members of the Putative Class overpaid for electricity and/or natural gas and therefore suffered common injuries, for which damages can be calculated. Accordingly, Plaintiff and the Class were injured when they paid their inflated variable rates.

91.     Indeed, Plaintiff Gant paid Direct Energy's exorbitant variable electricity and natural gas rates and thereby suffered an ascertainable loss. Direct Energy's conduct as alleged above was the cause of Plaintiff's loss, which was a reasonably foreseeable result of that conduct.

92.     Similarly, other members of the Putative Class have routinely paid substantially more for their energy needs since switching to and enrolling in Defendant's electricity and/or natural gas plans.

93.     Direct Energy's unfair and deceptive scheme as alleged herein constitutes a continuing violation over the course of each and every time Plaintiff (or any other class member) was overcharged for electricity and natural gas. Further, Direct Energy actively concealed their wrongful conduct by maintaining to Plaintiff and other members of the Putative Class, through Direct Energy's marketing, invoicing, and other communications directed to consumers, misrepresenting that the prices Direct Energy charged for electricity and natural gas would abide by the Regulations when, in reality, they were the result of Direct Energy's fraud. Plaintiff and other members of the Class could not discover through reasonable diligence the nature of Direct Energy's wrongful conduct earlier by virtue of Direct Energy's active concealment of their wrongdoing.

## CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of the following Class:

**All current and former Direct Energy customers who paid a variable rate for electricity and/or natural gas in connection with a property located within New Jersey at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment (the "Class").**

95.     Plaintiff reserves the right to modify or amend the definition of the proposed Class or to propose sub-classes as might be necessary or appropriate.

96.     Excluded from the Class are Defendants; any parent, subsidiary, or affiliate of Defendants; any entity in which Defendants have or had a controlling interest, or which Defendants otherwise control or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of Defendants.

97.     This action is brought as a class action for the following reasons:

a.  The Class consists of thousands of persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.  There are questions of law or fact common to the Class that predominate over any questions affecting only individual members, including:

   i.    whether Defendants violated N.J.S.A. §§ 56: 8-1 *et seq*.;

   ii.   whether Defendants violated N.J. Stat. Ann. § 48:3-49, *et. seq*.;

   iii.  whether Defendants' actions and omissions violated the New Jersey TCCWNA, N.J.S.A. § 56:12-15;

   iv.   whether Defendants breached the express terms of the Agreement;

   v.    whether Defendants' Agreement is void or voidable;

   vi.   whether Defendants breached the covenant of good faith and fair dealing by exercising their unilateral price-setting discretion in bad faith, *i.e.*, to price gouge;

   vii.  whether Defendants have been unjustly enriched through the sale of electricity and/or natural gas;

   viii. whether Plaintiff and the Class have sustained damages and, if so, the proper measure thereof; and

   ix.   whether Defendants should be enjoined from continuing to charge variable rates based on ambiguous terms.

c.  The claims asserted by Plaintiff are typical of the claims of the members of the Class;

d.  Plaintiff will fairly and adequately protect the interests of the Class, and Plaintiff has retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and ESCOs;

e.  Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants;

f.  Defendants have acted on grounds that apply generally to the Class, namely by failing to abide by the Regulations by setting forth an ambiguous pricing mechanism and is unreasonably discretionary, so that final injunctive relief prohibiting Defendants from continuing their deceptive practices is appropriate with respect to the Class as a whole;

g.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

  i.  Absent a class action, Class members as a practical matter will be unable to obtain redress, Defendants' violations of their legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendants will continue to retain their ill-gotten gains;

  ii.  It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions;

  iii.  When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Class;

  iv.  A class action will permit an orderly and expeditious administration of Class claims, foster economies of time, effort, and expense, and ensure uniformity of decisions;

  v.  The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

  vi.  Defendants have acted on grounds generally applicable to Class members, making class-wide monetary and injunctive relief appropriate.

98.  Defendants' violations of N.J.S.A. §§ 56:8-1 *et seq*. and 56:12-15, and the common law, are applicable to all members of the Class, and Plaintiff is entitled to have Defendants enjoined from engaging in illegal and deceptive conduct in the future.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J.S.A. §§ 56:8-1 *et seq.*)
### (On Behalf of Plaintiff and the Class)

99.     Plaintiff repeats and re-alleges the allegations contained in the previous paragraphs above as if fully set forth herein.

100.     The Consumer Fraud Act prohibits, *inter alia*:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise. . . .

N.J.S.A. § 56:8-2.

101.     The New Jersey Consumer Fraud Act ("CFA") "was intended to be one of the strongest consumer protection laws in the nation ... [and] should be construed liberally in favor of protecting consumers." *Homa v. Am. Express Co.*, 558 F.3d 225, 232 (3d Cir. 2009) (quoting *Huffman v. Robinson*, 221 N.J. Super. 315 (L. Div. 1986).

102.     Plaintiff and other members of the class are "persons" within the meaning of N.J.S.A. § 56:8-1(d).

103.     Defendants' conduct alleged herein constitutes a "sale" within the meaning of N.J.S.A. § 56:8-1(e).

104.     The EDECA, specifically N.J.S.A. § 48:3-84, provides as follows:

a. The rights, remedies and prohibitions accorded by the provisions of this act are in addition to and cumulative of any right, remedy or prohibition accorded by the common law or any statute of this State and nothing contained herein shall be construed to deny, abrogate or impair any such common law or statutory right, remedy or prohibition.

105. Direct Energy has engaged in unconscionable commercial practices by inducing consumers to switch electric or gas suppliers through initial low teaser rates and then automatically converted these customers to its higher-priced variable rate plans.

106. Direct Energy's unlawful conduct in violation of the CFA includes, but is not limited to, violating the contract requirements of the EDECA, specifically the Retail Choice Consumer Protection Regulations, N.J.A.C. 14:4-7.6, as discussed herein.

107. Direct Energy has engaged in unfair, unlawful and deceptive acts in trade and commerce which have the capacity and tendency to deceive and, in fact, did deceive Plaintiff and the Class, and damaged Plaintiff and Class members.

108. Defendants' misrepresentations and false, deceptive, and misleading statements and omissions with respect to the variable rates they charge for electricity and natural gas, as described above, constitute affirmative misrepresentations in connection with the marketing, advertising, promotion, and sale of electricity in violation of the CFA.

109. Defendants' false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to purchase electricity and/or natural gas from Defendant.

110. Defendants made material representations of fact that they knew, or should have known, were false and misleading and that had the tendency and capacity to be misleading.

111. Defendants made these false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

112. Plaintiff and Class Members did in fact rely on Defendants statements and omissions.

113. Defendants' intentional concealments were designed to deceive current and prospective variable rate customers to enroll in Defendants' electricity and/or natural gas plan.

Defendant benefits from reliance and deprives consumers from informed purchasing decisions and savings.

114.    Defendants' affirmative conduct and omissions constitute unlawful practices beyond a mere breach of contract. Rather, Defendants' practices are unconscionable and outside the norm of reasonable business practices. No reasonable consumer would enter into an energy contract in which the ESCO is permitted to charge whatever rates it wants. Yet, by deceiving consumers, Direct Energy has managed to convince them to enter into exactly this kind of contract. This is plainly an unconscionable result.

115.    Substantial aggravating circumstances are present here because Direct Energy's business behavior in question stands outside the norm of reasonable business practice in that it has victimized Plaintiff and the Putative class members, who are average consumers.

116.    Defendants' unlawful conduct was further aggravated by their violations of the Retail Choice Consumer Protection laws. Specifically, Defendants engaged in false and deceptive marketing in violation of N.J. Admin. Code § 14:4-7.3(d)(1). Defendants likewise failed to provide "a clear and unambiguous statement of the precise mechanism or formula by which the price will be determined," as required by N.J. Admin. Code § 14:4-7.6(b), and consequently deceived Plaintiff into consenting to a variable rate.

117.    Direct Energy has committed unconscionable business practices by setting its rates in bad faith in exercising its discretion to charge unreasonable rates to profiteer off its customers, who reasonably expected to pay reasonable rates for energy and not entirely arbitrary rates that violate New Jersey law.

118.    Plaintiff and other reasonable consumers interpreted and understood Direct Energy's terms to offer rates that would abide by the Regulations as set forth above, and the

affirmative representations or omissions discussed above may be construed as misleading and outside of reasonable business practices.

119.    Plaintiff and the other members of the Putative Class entered into agreements to purchase electricity and/or natural gas from Defendants for personal use and suffered ascertainable losses as a direct and proximate result of Defendants' actions in violation of the CFA.

120.    As a consequence of Defendants' wrongful actions, Plaintiff and the other members of the Putative Class suffered an ascertainable loss of monies based on the difference in the rate they were charged versus the rate they would have been charged had Defendants charged rates in accordance with the Regulations, or had they not switched to Defendants from their previous supplier.

121.    Plaintiff and other members of the Putative Class suffered an ascertainable loss caused by Defendants' misrepresentations and omissions because they would not have entered into an agreement to purchase electricity and/or natural gas from Defendants if the true facts concerning their rates had been known.

122.    Therefore, Defendants are liable to Plaintiff and the other members of the Putative Class for trebled compensatory damages, punitive damages, attorneys' fees, and the costs of this suit. N.J.S.A. §§ 56:8-2.11, 8-2.12, 8-19.

123.    Defendants know that they charge a rate that is unconscionably high, and the misrepresentations they make with regard to their rates were made for the sole purpose of inducing consumers to sign up for Direct Energy's electricity and/or natural gas supply so that they can reap outrageous profits to the direct detriment of New Jersey consumers without regard to the consequences high utility bills cause such consumers. As such, Defendants' actions were unconscionable and actuated by bad faith, lack of fair dealing, actual malice, or accompanied by

wanton and willful disregard for consumers' well-being. Defendants are therefore additionally liable for punitive damages, in an amount to be determined at trial.

124.    Defendants are also liable under the CFA because they violate a regulation promulgated by the Division of Consumer Affairs and the NJBPU for the purpose of protecting consumers from being victimized by false or misleading rate claims by a TPS like Direct Energy.

125.    N.J. Stat. Ann. § 48:3-85(f) provides that "in consultation with the Division of Consumer Affairs in the Department of Law and Public Safety, [the NJBPU] shall adopt . . . interim advertising and marketing standards for electric power suppliers . . . which standards shall include, but not be limited to, prohibiting electric power suppliers, gas suppliers, brokers, energy agents, marketers, private aggregators, sales representatives, and telemarketers from: (a) making false or misleading advertising claims to a potential residential customer . . ."

126.    Accordingly, pursuant to N.J. Admin. Code § 14:4-7.3(d)(1), ESCOs are "prohibited from [m]aking false or misleading advertising claims to a potential residential customer." *Accord* N.J. Admin. Code § 14:4-7.4(n)(1) (same).

127.    One of the standards adopted to prohibit TPS from engaging in false and misleading marketing and advertising includes the requirement that a "TPS shall not make misrepresentations, in its solicitations or its marketing materials or any way, in violation of any standards implemented by the Board pursuant to the Act, of any other consumer protection laws or rules implemented or enforced by the Division of Consumer Affairs, or of the mechanics of the customer enrollment process adopted by the Board." N.J. Admin. Code § 14:4-7.4(i).

128.    Another standard implemented by the BPU to ensure that consumers have all of the information they need to make an informed choice, rather than being induced to enter into an agreement with a TPS for electricity and natural gas service based on false and misleading rate claims, is that "[a] TPS contract shall clearly and conspicuously . . . include explicit terms and

conditions, which shall include, at a minimum . . . a clear and unambiguous statement of the precise mechanism or formula by which the [variable] price will be determined." N.J. Admin. Code § 14:4-7.6(b)(2).

129.    Direct Energy violated that requirement because its variable rate term does not contain a clear and unambiguous statement of the precise mechanism or formula by which the [variable] price will be determined. Had Direct Energy disclosed the precise mechanism or formula by which the variable price will be determined, namely that Direct Energy charges a rate primarily based on undisclosed factors and its desire to reap outrageous and unreasonable profits, and that its rate would be many multiples higher than his previous supplier's rates, then Plaintiff would not have entered into an agreement to purchase electricity and natural gas from Direct Energy.

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(On Behalf of Plaintiff and the Class)**

130.    Plaintiff repeats and re-alleges the allegations contained in the previous paragraphs above as if fully set forth herein.

131.    Plaintiff and the other members of the Putative Class entered into valid contracts with Direct Energy for the provision of electricity and/or natural gas (the "Agreement").

132.    The Agreement states, "This Agreement represents the entire Agreement between the parties with regard to the subject matter hereof, **is subject to all valid and applicable laws and to all present and future orders, rules, and regulations of the board and any other authority having jurisdiction over the subject matter hereof**, and supersedes any previous promises, understandings and agreements between the parties." **Exhibit A** at § 24 (emphasis added).

133.    One regulation implemented by the New Jersey Board of Public Utilities to ensure that consumers have all of the information they need to make an informed choice, rather than being

induced to enter into an agreement with a TPS for electricity and natural gas service based on false and misleading rate claims, is that "[a] TPS contract shall clearly and conspicuously . . . include explicit terms and conditions, which shall include, at a minimum . . . a clear and unambiguous statement of the precise mechanism or formula by which the [variable] price will be determined." N.J. Admin. Code § 14:4-7.6(b)(2).

134.   Defendants violated that requirement because their variable rate term does not contain a clear and unambiguous statement of the precise mechanism or formula by which the variable price will be determined. Had Direct Energy disclosed the precise mechanism or formula by which the variable price will be determined, namely that Direct Energy charges a rate primarily based on undisclosed factors and their desire to reap outrageous and unreasonable profits, and that its rate would be many multiples higher than local utility rates, then Plaintiff would not have entered into an agreement to purchase electricity and natural gas from Direct Energy.

135.   The act of imposing unreasonable and exorbitant energy prices – unrelated to any precise mechanism or formula — in violation of the company's representations amounts to a breach of a valid contract which caused Plaintiff and class members to suffer actual, ascertainable losses.

136.   Plaintiff and other members of the class have performed all material obligations imposed on them in the contract. Defendants have not performed the obligations imposed on them in the contract.

137.   No reasonable consumer, including Plaintiff Gant, would interpret the contract as granting Defendants unfettered discretion to maximize profits at the expense of their customers.

138.   Further, the Agreement itself is illegal and void and unenforceable *ab initio* because it violates N.J. Admin. Code § 14:4-7.6(b)(2).

139.     Under New Jersey law, any contract made in consideration of an act forbidden by law or against public policy is unenforceable.

140.     Plaintiff and the members of the Putative Class were injured as a result because they entered into the Agreement and were billed, and they paid, a charge for electricity and/or natural gas that was higher than it would have been had they not switched to Direct Energy's electricity and/or natural gas plan.

141.     By reason of the foregoing, Defendants are liable to Plaintiff and the Putative Class for the damages that they have suffered as a result of Defendants' actions, the amount of such damages to be determined at trial.

### THIRD CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (In the Alternative to the Second Cause of Action)
### (On Behalf of Plaintiff and the Class)

142.     Plaintiff repeats and re-alleges the allegations contained in the previous paragraphs above as if fully set forth herein.

143.     Plaintiff brings this Cause of Action in the alternative to the Second Cause of Action.

144.     Every contract in New Jersey contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract. The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms. Under this covenant, we are not to suppose that one party is put at the mercy of the other but will read in any necessary conditions to ensure a mutuality of obligation under fair terms.

145.     Under its Agreement, Defendants had limited unilateral discretion to set the variable rate for electricity and natural gas rates.

146.     When a contract contains an indefinite price term – such, as here, the seller, Direct Energy, does not have unfettered discretion to set the price.

147.     Here, Defendants have failed to satisfy this obligation. Defendants have unilaterally imposed exorbitant, undisclosed rates on its customers, including Plaintiff and the members of the Putative Class.

148.     Defendants' conduct violated the marketing and pricing disclosure consumer protection standards promulgated in the Retail Choice Consumer Protection laws, and thereby violated our community standards of decency, fairness, and reasonableness.

149.     Defendants breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably by exploiting its unilateral access to information (namely, its actual pricing practices) to price gouge and frustrate Plaintiff and other Putative Class members' reasonable expectations of the parties' agreement.

150.     Direct Energy's performance of their discretionary functions under the Agreement, as alleged herein to maximize their revenue from variable electric and natural gas rates, impedes the right of Plaintiff and other members of the Putative Class to receive benefits that they reasonably expected to receive under the contract.

151.     Defendants acted in bad faith by abusing their discretion and purposefully hiding that their variable rates would not comply with the Regulations – vital information that is material to the Plaintiff and the Putative Class Members' decisions to enroll in and remain enrolled in Direct Energy's plans – to ensure that the Plaintiff and Putative Class Members continued to perform under the contract even though Defendants knew their variable rates had no specific formula by which they are calculated, and always significantly higher than the local utilities' rates in the market at large, which are reasonable rates in the market.

152.    As such, Direct Energy charged Plaintiff and the Putative Class commercially unreasonable rates and in doing so acted in bad faith or with improve motive.

153.    Plaintiff and the Class have been damaged by Direct Energy's breach of the covenant of good faith in an amount to be determined at the trial of this action.

## FOURTH CAUSE OF ACTION
### VIOLATIONS OF THE TRUTH-IN-CONSUMER CONTRACT, WARRANTY, AND NOTICE ACT ("TCCWNA") (N.J.S.A. § 56:12-15) (On Behalf of Plaintiff and the Class)

154.    Plaintiff repeats and re-alleges the allegations contained in the previous paragraphs above as if fully set forth herein.

155.    Plaintiff and those similarly situated are "consumers" within the meaning of N.J.S.A. § 56:12-15.

156.    Defendants are "sellers" within the meaning of N.J.S.A. §§ 56:12-15 and -17.

157.    Defendants violated the TCCWNA with respect to Plaintiff and the Class by inducing Plaintiff and the members of the Putative Class to switch electric and/or natural gas suppliers to Direct Energy using tactics that violate the CFA, as alleged above and in the First Cause of Action. Thus, Defendants violated Plaintiff's and the Putative Class Members' clearly established legal rights or responsibilities of Defendants under the CFA and, therefore, Defendants violated the TCCWNA.

158.    As a result of Defendants' violations of the TCCWNA, Plaintiff and those similarly situated are entitled to statutory damages of not less than $100 for each of Defendants' TCCWNA violations, as provided by N.J.S.A. § 56:12-17.

## FIFTH CAUSE OF ACTION

## UNJUST ENRICHMENT
### (In the Alternative to the Second Cause of Action)
### (On Behalf of Plaintiff and the Class)

159.    Plaintiff repeats and re-alleges the allegations contained in the previous paragraphs above as if fully set forth herein.

160.    Plaintiff brings this Cause of Action in the alternative to the Second Cause of Action.

161.    Plaintiff and the Class members conferred a benefit on Defendants in the form of the gross revenues Defendants derived from the money they paid to Defendants for electricity and/or natural gas service.

162.    Defendants had an appreciation or knowledge of the benefit conferred on them by Plaintiff and the Class members.

163.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff and the proposed Class members' enrollment into electricity and/or natural gas plans and payment of variable rates on those plans, which retention of such revenues under these circumstances is unjust and inequitable because Defendants failed to abide by the Regulations as set forth herein and charged Plaintiff and Class members exorbitant rates for energy service. This caused injuries to Plaintiff and members of the proposed Class because they would not have enrolled in Direct Energy's electricity and/or natural gas plans if the true facts concerning those plans and the variable rates had been known.

164.    Defendants accepted and retained the benefit in the amount of the gross revenues they derived from sales of energy services to Plaintiff and the Class members.

165.    Defendants have thereby profited by retaining the benefit under circumstances which would make it unjust for Defendants to retain the benefit.

166.    Plaintiff and the Class members are, therefore, entitled to restitution in the form of the revenues derived from Direct Energy's sale of electricity and/or natural gas.

167.    As a direct and proximate result of Defendants' actions, Plaintiff and Class members have suffered in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

A.    Certifying this matter as a class action pursuant to Fed. R. Civ. P. 23;

B.    Appointing Plaintiff as class representative, and appointing Plaintiff's attorneys as class counsel;

C.    Awarding compensatory and punitive damages in favor of Plaintiff and the other Class Members against Defendants for all damages sustained as a result of Defendants' wrongdoing in an amount to be determined at trial;

D.    Awarding Plaintiff and the Class Members actual damages, compensatory damages and treble damages pursuant to the CFA at N.J.S.A. § 56:8-19;

E.    Awarding Plaintiff and the Class Members the maximum civil penalties for each and every violation of the TCCWNA, pursuant to N.J.S.A. § 56:12-17;

F.    Awarding Plaintiff and the Class their reasonable attorneys' fees and costs pursuant to the CFA (N.J.S.A. § 56:8-19) and the TCCWNA (N.J.S.A. § 56:12-17);

G.    Awarding injunctive relief;

H.    Awarding pre-judgment and post-judgment interest and costs of suit; and

I.    Awarding any and all other relief that this Court may deem to be just and practicable.

### DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. Rule 38, Plaintiff hereby demands a trial by jury.

Dated:  August 4, 2022

Respectfully Submitted By:

*/s/ Jonathan Shub*
Jonathan Shub (N.J. Bar #317842020)
Kevin Laukaitis (N.J. Bar # 155742022)
**SHUB LAW FIRM LLC**
134 Kings Highway East
2nd Floor
Haddonfield, NJ 08033
Phone: (856) 772-7200
Email:  jshub@shublawyers.com
klaukaitis@shublawyers.com

Marc Edelson (*Pro Hac Vice* to be
applied for)
Eric Lechtzin (NJ Bar # 011841992)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA  18940
Phone: (215) 867-2399
Email: medelson@edelson-law.com
elechtzin@edelson-law.com

*Attorneys for Plaintiff and the Putative
Class*